IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ORBITAL ENGINEERING, INC., | ) |
| Plaintiff, | ) Civil Action No. 2:21-cv-491 <br> ) |
| v. | ) <br> ) **Jury Trial Demanded** |
| BRYAN T. GEHRLING, | ) |
| Defendant. | ) |

## COMPLAINT

Orbital Engineering, Inc. ("Orbital" or the "Company") files this Complaint against Bryan T. Gehrling ("Gehrling" or "Defendant"):

## INTRODUCTION

1. This case concerns a former employee's deliberate breach of his contractual post-employment non-solicitation obligations to benefit his new employer. Gehrling was employed by Orbital as the Company's Regional Manager of Asset Integrity. He was responsible for seeking, soliciting, developing and servicing Orbital's business relationships with a number of the Company's clients. To protect its legitimate business interests, Orbital required Gehrling to execute a non-solicit agreement as a condition of his employment with the company, which prohibited Gehrling from soliciting Orbital's clients and employees for a period of 180 days after his resignation. Gehrling resigned from his position with Orbital on October 30, 2020.

2. Unbeknownst to Orbital, Gehrling accepted a similar position with Middough, Inc. ("Middough") – one of Orbital's director competitors. In that role, Gehrling has been systematically soliciting clients he previously serviced in his position with Orbital, in direct violation of his non-solicit obligations to the Company. What is worse, Gehrling has exploited his knowledge of Orbital's confidential and proprietary information – including his knowledge

concerning upcoming business opportunities and key decision makers – to divert to Middough specific business opportunities that he learned about solely by virtue of his employment with Orbital.  To help effectuate that scheme, Gehrling utilized the mobile phone number that he used on Orbital's behalf – i.e., the same phone number that he listed on quotes and proposals previously sent by him on Orbital's behalf – effectively to intercept inquiries from unsuspecting Orbital clients who thought they were calling Orbital.  Gehrling has also solicited at least one Orbital employee in an effort to persuade the employee to terminate the employee's relationship with Orbital and to work for Middough instead.

3. Because Gehrling concealed his intentions when he resigned from Orbital, the Company did not learn about Gehrling's actions until very recently, when communications from Orbital's customers intended for Gehrling were inadvertently sent to his former Orbital email address instead.  Also recently, Orbital sent a follow-up inquiry to a customer with respect to a proposal previously sent by the Company, only to have the customer tell Orbital that they had already spoken to Gehrling and gave the project to Middough instead.

4. Gehrling's actions have and, absent relief from the Court, will continue to cause monetary and irreparable harm to Orbital in the form of lost profits, lost customers, lost business opportunities, reputational harm and damage to the Company's goodwill (among other harm).

5. Accordingly, Orbital seeks monetary relief to compensate the Company for all lost profits and other damages sustained by the Company with respect to products and services improperly diverted by Gehrling to Middough.  Further, because Gehrling misled Orbital and actively concealed his intentions to breach his obligations to the Company, Orbital seeks an order enjoining Gehrling from soliciting any Orbital clients or employees for a period of six months from the date of the entry of the Court's order.

## THE PARTIES

6. Orbital is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, having its principal place of business at 1344 Fifth Avenue, Pittsburgh, Pennsylvania 15219.

7. Gehrling is an individual who, upon information and belief, resides in Cook County, Illinois.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 because it involves claims that arise under the laws of the United States and otherwise involves claims that are so related to those claims that they form part of the same case or controversy under Article III of the United States Constitution.

9. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this action involves citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over Defendant because he has conducted activities in, maintained sufficient contacts with and has otherwise caused harm in the forum in a manner sufficient to place him within the personal jurisdiction of this Court, as set forth more fully below.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district and Defendant is otherwise subject to the Court's jurisdiction in this district.

**FACTUAL BACKGROUND**

A.   **Orbital's Business and Protectable Interests**

12.   Orbital provides full-service solutions in engineering and design, construction management and QA/QC, safety and asset integrity services.

13.   Founded in 1969, the Company employs more than 300 engineering and support staff members across seven major offices located in Pittsburgh and Philadelphia, Pennsylvania, Hammond, Indiana, Detroit, Michigan, St. Louis, Missouri, Houston, Texas, and Baton Rouge, Louisiana.  The Company services a broad range of industries, including infrastructure, metals, utilities, refinery, chemical, pipeline, terminal, and gas processing and storage.

14.   The Company employs highly trained individuals, all of whom are focused on providing the Company's customers with an unparalleled service experience.

15.   The industry in which Orbital operates is highly competitive.

16.   Orbital devotes significant resources, time and money to maintain its competitive position in the marketplace.

17.   Orbital devotes significant resources to train its employees to ensure that they acquire and maintain the knowledge and skills necessary to provide effective sales and service support to the Company's customers.

18.   Orbital also has devoted significant time and money to develop long-term customer relationships and goodwill.  Those relationships are built on trust and personal interactions with decision makers and could not easily be replicated without a substantial investment of time, effort and money.

19.   Orbital's customer-facing employees develop close personal relationships with the Company's customers.

20. In carrying out its business activities, Orbital relies on a broad range of confidential and proprietary business information that is the product of Orbital's substantial expenditure of time, expertise and experience. That information includes, without limitation, information concerning bidding, pricing, costs and margins; prospective business opportunities; customers' needs, requirements and preferences; service delivery methodologies and techniques; and business development strategies.

21. Orbital's confidential information derives its value from remaining confidential.

22. Orbital takes reasonable efforts to maintain and safeguard the confidentiality of its confidential and proprietary information. Those measures include limiting access to Orbital's confidential information to a "need to know" basis and requiring employees (such as Gehrling) be subject to confidentiality provisions in the Orbital employee handbook that forbid the disclosure and misuse of the Company's confidential information.

23. To fully guard against the risk of the disclosure and misuse of its confidential information, to protect its customer relationships, and to avoid the expense and difficulty of monitoring Gehrling's post-employment conduct, Orbital required Gehrling contractually to promise to abide by non-solicitation and confidentiality obligations as a condition of his employment with Orbital.

24. The success of Orbital's business depends on its ability to maintain long-term contractual relationships and to protect its customer relationships, goodwill and strategic information.

25. If disclosed, information regarding Orbital's customers, pricing, margins and other business strategy matters would provide an unfair advantage to a competitor.

**B.     Gehrling's Employment by Orbital**

26.     Gehrling was hired by Orbital on or about October 7, 2017 as an Engineer III. By 2019, Orbital promoted Gehrling to the position of Asset Integrity Regional Manager for the Chicago, Detroit, Philadelphia, and Pittsburgh offices. In that role, Gehrling oversaw and executed long-term, ongoing business development efforts for the Company.

27.     Gehrling was responsible for – and routinely called upon and visited – more than 50 Orbital clients across 15 states operating in several industries, including metals, power generation, refinery, electric and gas utilities, and aggregate mining and extraction.

28.     Before he was hired by Orbital, Gehrling had no experience in sales or business development.

29.     Orbital provided Gehrling with extensive and valuable training and education to enable him to develop the skills necessary to perform his professional duties and responsibilities.

30.     As an Asset Integrity Regional Manager, Gehrling was intimately familiar with Orbital's customer information as well as the Company's business development programs and plans. He has intimate knowledge regarding Orbital's services, pricing, margins, marketing strategies, customers, customer contacts and decision makers, customer preferences, requirements, and business strategies.

31.     In his position, Gehrling identified sales opportunities and solicited and developed business with new customers, maintained relationships with current clients and helped formulate and execute the Company's sales strategy as a whole. Gehrling was a point of contact for many of the Company's customers.

32.     Gehrling was among the individuals who had approval to access the Company's highly sensitive information.

C.   **The Non-Solicit Agreement**

33.   When he was hired by Orbital, Gehrling signed an Employment Agreement (the "Non-Solicit Agreement"), a copy of which is attached as Exhibit A hereto.

34.   Pursuant to the Non-Solicit Agreement, Gehrling agreed that, for 180 days after the termination of his employment with Orbital, he would not "directly or indirectly solicit competitive business from any client of [Orbital] (including any potential client of Orbital Engineering, Inc.) that was contacted, solicited, or served by [him]." (Ex. A at 1.)

35.   Further, Gehrling agreed that, during that same 180-day time-period, he would not "directly or indirectly recruit, solicit, or otherwise induce or attempt to induce any employee of [Orbital] to terminate his or her employment with the Company or otherwise act contrary to the interests [Orbital]." (*Id.*)

36.   In connection with his employment with Orbital, Gehrling also certified his receipt, review and understanding of the Orbital Employee Handbook.

37.   Pursuant to the confidentiality provisions of the Employee Handbook, Gehrling affirmatively acknowledged that, by reason of his employment with Orbital, he would acquire confidential information relating to the Company's business, and that Gehrling would not use or disclose any such information except for Orbital's benefit:

> Orbital Engineering, Inc.'s customers entrust the company with important information relating to their businesses. In safeguarding the information received, Orbital Engineering, Inc. earns the respect and further trust of those customers. Each employee assumes an obligation to maintain confidentiality, even after they leave the company. In addition, Orbital Engineering, Inc. maintains its own proprietary and confidential information with regard to its business practices and endeavors. Because of its seriousness, disclosure of confidential information may lead to the termination of employment and can result in civil and/or criminal penalties, for both the employee and Orbital Engineering, Inc. Examples of confidential information that cannot be disclosed without prior approval could include, but are not limited to, invention description(s), technical and business information relating to proprietary ideas and inventions, employee personal

information, ideas, patentable ideas, trade secrets, drawings and/or illustrations, patent searches, existing and/or contemplated products and services, research and development, production, costs, profit and margin information, finances and financial projections, customers and customer contact information which is not otherwise public, clients and client contact information that is not otherwise public, marketing, and current or future business plans and models, regardless of whether such information is designated as "Confidential Information" at the time of its disclosure.

In the event an employee receives a request for Orbital Engineering, Inc. proprietary or confidential information, or third party proprietary or confidential information, he or she should refer the request to their General Manager. No one is permitted to remove or make copies of any company records, reports, or documents without prior General Manager approval.

(Employee Handbook § 1.3.)

38. The restrictions in Gehrling's Non-Solicit Agreement and the Employee Handbook are intended to guard against the risk of disclosure and misappropriation of Orbital's confidential information, to protect Orbital's customer relationships and goodwill, and to avoid the expense and difficulty of monitoring Gehrling's post-employment conduct.

**D.   Gehrling's Breach of the Non-Solicit Agreement**

39. Gehrling resigned from his employment with Orbital on October 30, 2020.

40. When he announced his resignation, Gehrling advised the Company that he did not know what career path he would pursue, but that he wanted to "re-evaluate" his circumstances and "go in a different direction." He specifically advised Orbital that he did not intend to work for a competitor.

41. In reliance on those representations by Gehrling, Orbital requested Gehrling to review his communications and documents and prepare a detailed list of contacts and upcoming business opportunities to help transition his work to another Orbital employee.

42.     It appears that Gehrling misled Orbital about his intentions. After resigning from Orbital, Gehrling accepted a position with Middough, a direct competitor to Orbital, in November, 2020 – i.e., less than a month after he resigned from Orbital.

43.     At Middough, Gehrling touts himself as the "Senior Business Development Manager," with responsibility for (among other areas) Northwest Indiana and Chicago regions in the refinery, power, metals, utilities, mining/aggregate and manufacturing industries.

44.     Like Orbital, Middough is a full-service engineering consulting firm.

45.     Orbital recently discovered that, in violation of his post-employment obligations to the Company, Gehrling has been soliciting Orbital's clients and diverting Orbital's business opportunities – i.e., the same clients and the same opportunities that Gehrling serviced for Orbital. Upon information and belief, Gehrling began soliciting Orbital's customers and misusing Orbital's confidential information shortly after he joined Middough.

46.     As Orbital recently became aware, Gehrling recently diverted at least three separate business projects from Orbital customers previously serviced by Gehrling, which projects Gehrling learned about during his employment with Orbital. Gehrling had significant dealings and interactions with, and knew confidential and proprietary information about, those customers during his employment with Orbital.

47.     Upon information and belief, several Orbital customers have contacted Gehrling with respect to proposals and bids previously issued by Gehrling on Orbital's behalf using the mobile phone number previously listed by Gehrling on those proposals and bids, not knowing that Gehrling had resigned from Orbital and joined a competitor. When they did so, Gehrling has, upon information and belief, diverted (and attempted to divert) those opportunities to Middough.

48. Upon information and belief, Gehrling has improperly used, disclosed or relied upon Orbital's confidential information in connection with his employment by Middough.

49. Upon information and belief, Gehrling utilized the information that he knew – and which he compiled for Orbital in the Business Development Spreadsheet – to solicit Orbital's customers on behalf of and for the benefit of Middough.

50. Upon information and belief, Gehrling retained Orbital's confidential information on his personal mobile device, including detailed contact information and notes concerning upcoming business opportunities, and has utilized that information to contact and solicit Orbital customers on behalf of Middough.

51. Gehrling has also solicited at least one Orbital employee in an effort to persuade that employee to resign from the employee's employment with Orbital and to work for Middough instead.

52. As a direct and proximate result of Gehrling's breach of the Non-Solicit Agreement and his misuse and disclosure of Orbital's confidential information, Orbital has suffered significant monetary damages and reputational and other irreparable harm.

## COUNT I
### Breach of Contract

53. The allegations of paragraphs 1 through 52 are incorporated by reference as if fully set forth herein.

54. Gehrling executed the Non-Solicit Agreement as a condition of his employment with Orbital. (*See* Exhibit A.)

55. The Non-Solicit Agreement contains a post-employment non-solicitation covenant that is reasonable in scope and duration. That covenant is a material provision of the Non-Solicit Agreement. (*See* Exhibit A.)

56. Orbital has performed all of its obligations under the Non-Solicit Agreement.

57. Gehrling has materially breached the Non-Solicit Agreement by (among other means) (i) soliciting Orbital's customers which Gehrling solicited, contacted or served during his employment with Orbital; and (ii) recruiting, soliciting or otherwise attempting to induce another Orbital employee to terminate their employment with Orbital.

58. As a direct and proximate result of Gehrling's material breaches of the Non-Solicit Agreement, Orbital has suffered and will continue to suffer both monetary and irreparable harm, including, but not limited to, lost profits, lost customers, lost business opportunities, the loss of proprietary and confidential information, and harm to the Company's reputation, goodwill and competitive advantage.

## COUNT III
### Procurement of Information by Improper Means

59. The allegations of paragraphs 1 through 52 are incorporated by reference as if fully set forth herein.

60. Orbital has developed and utilizes a broad range of confidential and proprietary information in connection with its business activities as set forth above, including, without limitation, information concerning bidding, pricing, costs and margins; prospective business opportunities; customers' needs, requirements and preferences; service delivery methodologies and techniques; and business development strategies.

61. Gehrling acquired Orbital's confidential information by improper means as set forth above and for an improper purpose – i.e., to disrupt and interfere with Orbital's customer relationships and to divert business from Orbital to advance the interests of Orbital's direct competitor.

62. As a direct and proximate result of Gehrling's misconduct, Orbital has suffered and will continue to suffer both monetary and irreparable harm, including, but not limited to, lost profits, lost customers, lost business opportunities, the loss of proprietary and confidential information, and harm to the Company's reputation, goodwill and competitive advantage.

WHEREFORE, Orbital respectfully requests that the Court enter judgment against Gehrling:

a. awarding Orbital monetary damages in excess of $75,000 according to proof at trial, plus interest, costs and expenses;

b. enter an order enjoining Gehrling from soliciting Orbital's customers or employees for a period of 180 days from the date of the Court's order; and

c. granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

DENTONS COHEN & GRIGSBY P.C.

By: /s/ Fridrikh V. Shrayber
Fridrikh V. Shrayber
Pa. Id. No. 208083
Julie A. Patter
Pa. Id. No. 314458

625 Liberty Avenue, 5th Floor
Pittsburgh, PA  15222-3152
Ph: (412) 297-4900 / Fax: (412) 209-0672
fred.shrayber@dentons.com
julie.patter@dentons.com

Counsel for Plaintiff,
Orbital Engineering, Inc.

Dated:  April 14, 2021
3611270.v1